**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | RICHARD B. HENRY, | : | Chapter 13 |
| | JENNA L. HENRY, | : | |
| | | : | |
| | Debtors. | : | Bky. No. 10-16529 ELF |

# M E M O R A N D U M

## I. INTRODUCTION

This case presents both legal and factual issues regarding the valuation of an automobile pursuant to 11 U.S.C. §506(a)(1) and (2) in a chapter 13 case.

Debtor Richard B. Henry ("Mr. Henry") and Jenna L. Henry (collectively, "the Debtors") commenced this chapter 13 bankruptcy case on August 2, 2010. On September 8, 2010, World Omni Financial Corp. ("World Omni") filed a proof of claim asserting a secured claim in the amount of $19,419.93. The property securing the claim is a 2006 Toyota Tundra pickup ("the Vehicle") that is owned jointly by the Debtors. (See Proof of Claim No. 1).

On May 16, 2011, the Debtors filed a Motion for Valuation of Security ("the Motion") (Doc. # 42) asserting that the value of the collateral securing World Omni's claim does not exceed $10,000.00. Pursuant to 11 U.S.C. §506(a), the Debtors requested that the court reduce World Omni's secured claim to $10,000.00 by bifurcating it into secured and unsecured components. In its June 1, 2011 Response to the Motion (Doc. # 46), World Omni asserted that the value of the Vehicle is $17,075.00.

An evidentiary hearing commenced on June 14, 2011 and was completed on July 12, 2011. Mr. Henry testified for the Debtors and Paul Runiewicz ("Mr. Runiewicz") testified as an

expert witness on behalf of World Omni. Among the documents admitted into evidence were several photographs of the Vehicle, Mr. Runiewicz's written report (which included various used car market reports), and several other appraisals (admitted into evidence by agreement and without supporting testimony).

For purposes of 11 U.S.C. §506(a), I determine the replacement value of the Vehicle to be $15,045.00. Consequently, I will enter an order allowing World Omni's claim as secured in the amount of $15,045.00 and unsecured in the amount of $4,374.93.

## II. GENERAL LEGAL FRAMEWORK

Section 506(a) of the Bankruptcy Code provides, in pertinent part:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
>
> (2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

Section 506(a)(2) is a recent addition to the Code – it was added in 2005 by §327 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119

Stat. 23 (2005), effective October 17, 2005 ("BAPCPA"). When §506(a)(2) was added to the Code, the provision formerly codified as §506(a) was not altered, but rather was recodified as §506(a)(1).

In In re Fareed, 262 B.R. 761 (Bankr. N.D. Ill. 2001), the court provided a cogent summary of the function of the provision formerly codified as §506(a), and now codified as §506(a)(1), as it pertains to chapter 13 cases:

> **Claim allowance, under § 502**, establishes the total amount of the creditor's "allowed" claim. Debtors and other parties may object to proofs of claim, contending that the claim should be allowed in an amount less than stated in a proof of claim, but only on the grounds for objection stated in [§ 502(b)]. **Collateral valuation, under § 506(a)**, establishes how a claim, supported by a security interest in the debtor's property, is bifurcated into secured and unsecured claims. The "secured claim", arising from collateral valuation, if allowed under § 502, authorizes a secured creditor to demand the minimum plan treatment specified in § 1325(a)(5). Finally, **plan confirmation** determines whether the plan proposed by the debtor meets the minimum requirements of the Code, but in the absence of objection from the holder of an allowed secured claim, a plan provision calling for payment of the claim different from the required minimum is nevertheless effective, and may not be collaterally attacked.

262 B.R. at 768 (emphasis added).

Consistent with the architecture of the Code described in Fareed, it is apparent that part of the Debtors' chapter 13 rehabilitation strategy is to obtain a determination that World Omni's claim is partially secured and partially unsecured so that they may invoke the chapter 13 plan process to modify the claim under 11 U.S.C. §1322(b)(2), provide for payment of only the allowed secured claim under 11 U.S.C. §1325(a)(5) and relegate the unsecured portion of the claim to a pro rata distribution along with other unsecured creditors.

The first step in the Debtors' strategy requires the valuation of the Vehicle (the collateral for their debt) under 11 U.S.C. §506(a).  See also Fed. R. Bankr. P. 3012.  The debtor bears the burden of proof on the valuation issue under §506(a).  See, e.g., In re Erb, 2011 WL 2600647, at *2 (Bankr. M.D. Pa. June 29, 2011); In re Weichey, 405 B.R. 158, 164 (Bankr. W.D. Pa. 2009); In re Finnegan, 358 B.R. 644, 649 (Bankr. M.D. Pa. 2006).

### III. FINDINGS OF FACT

Based on the evidentiary record, I make the following findings of fact.

1. The Debtors purchased the Vehicle new from Fort Myers Toyota, in Fort Myers, Florida, on November 16, 2006, for a purchase price of $33,682.01, subject to a $4,000.00 rebate.

2. The Debtors financed the Vehicle's entire purchase price.  (See Proof of Claim No. 1).[1]

3. World Omni provided the financing in the transaction.  (Id.).

4. At the time of the transaction, the Debtors were residing in Florida, where Mr. Henry was employed as a construction manager.

5. The Debtors acquired the Vehicle so that Mr. Henry could use it at job sites in connection with his employment in the construction industry.

---

[1] The amount financed in the transaction was $34,335.14 (compared to the $29,682.01 purchase price after rebate).  Because (a) the Debtors put no money down, (b) the debt on their trade-in vehicle exceeded the trade-in credit they received, and (c) they purchased other services and products in the transaction ("gap protection" and "USWC Maintenance"), the Debtors borrowed more than $4,500.00 in excess of the Vehicle's after rebate purchase price.  (See Proof of Claim No. 1).

6.  Some time thereafter, and prior to the commencement of their bankruptcy case, the Debtors moved to Pennsylvania.

7.  Over the past two years, the Debtor has been employed in the automotive industry.

8.  Currently, he is employed by CK Colors, a company that specializes in body work on automobiles. His job requires him to repair dents and scratches on automobiles. Prior to his current job, he was employed by a Toyota dealership, where he performed similar work.

9.  The Vehicle is a pickup truck with a 4.7-liter, 8-cylinder engine. It has rear-wheel, two-wheel drive, which makes it a popular model in the southern United States, but less practical and valuable in the northeastern United States, due to the frequent snowy and icy driving conditions.[2]

10. As of July 1, 2011, the Vehicle's odometer showed 83,454 miles.

---

[2] The Debtors contended that the rear-wheel, two-wheel drive feature reduced the value of the Vehicle. However, neither party put sufficient evidence into the record to allow me to decide whether there are objectively quantifiable price differences for this vehicle in different parts of the country. While the Debtors' argument has some superficial appeal, there are countervailing considerations which, in the absence of more specific expert evidence, cannot be appropriately evaluated. For instance, because two-wheel drive pickup trucks are less popular in the northeast, there are fewer such vehicles in the used car market; thus, perhaps, a particular individual interested in buying this model, despite its potential drawbacks, might have more difficulty finding one. And, while supply scarcity might then tend to drive up the price of the vehicle, this particular individual might have been interested in the two-wheel drive model only because of a lower price in the first instance. On the other hand, low demand for two-wheel drive models in the Northeast United States might tend to depress their price. Another broader relevant question may be the market substitutability of four-wheel vehicles for two-wheel models. In sum, the minimal evidence presented on this subject at the hearing raises more questions than answers, and failed to persuade me, one way or the other, that there are objectively quantifiable price differences for this vehicle in different regions of the country.

11. The engine is in good condition.[3]

12. With the exception of some paint damage on right side of the front bumper, the body of the Vehicle has no discernible scratches or other defects.[4]

13. The cost of repairing the damage to the front bumper is $563.95.[5]

14. The replacement value of the Vehicle as of the date of the filing of the Debtors' bankruptcy petition was $15,045.00.

## IV. DISCUSSION

### A.

As will be discussed below, the parties presented opposing evidence regarding the value of the Vehicle. Initially, before describing and evaluating the evidence, I must consider the appropriate valuation methodology to be employed.

Prior to BAPCPA and the addition of §506(a)(2), §506(a) did not direct the courts to

---

[3] While Mr. Henry testified in some detail regarding certain body repairs the Vehicle requires, he did not suggest that any engine problems exist.

[4] The condition of the body of the Vehicle was a disputed issue during the hearing. The photographs presented in connection with Mr. Runiewicz's testimony lead me to make this finding.

[5] The Debtor presented evidence suggesting that the repair cost is $2,175.03. (See Ex. D-3). Mr. Runiewicz testified that the damage was minor and could be repaired for $100.00. I find that both sides overstated their positions, but based on the photographs of the damage, the likely expense is far closer to Mr. Runiewicz's low estimate than to Mr. Henry's high estimate. I have accepted the estimate provided in the PDA condition report, which World Omni offered into evidence as Ex. R-1.

employ any specific methodology in determining the value of property. The Supreme Court addressed the issue of the proper valuation methodology in <u>Associates Commercial Corp. v. Rash</u>, 520 U.S. 953, 965 (1997). In <u>Rash</u>, the Court held that in a reorganization case in which the debtor proposes to retain and use the property being valued under §506(a) (and, in particular, treat the creditor's claim in the chapter 13 plan under 11 U.S.C. §1325(a)(5)(B)), the valuation must be based on the "replacement value" of the secured property. 520 U.S. at 960, 965. The Court defined replacement value as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." <u>Id.</u> at 960.

As a judge in this district observed in 2003, "[t]he Supreme Court provided little more guidance than this, noting that the standard it enunciated 'leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented.'" <u>In re King</u>, 2003 WL 22110779, at *4 (Bankr. E.D. Pa. Sept. 2, 2003) (per Sigmund, J.) (quoting <u>Rash</u>, 520 U.S. at 965 n. 6). What little guidance exists is found in footnote 6 of the <u>Rash</u> opinion, where the Court stated that replacement value should exclude certain items that a debtor would not receive when retaining an automobile, such as warranties, inventory storage, and reconditioning. 520 U.S. at 965 n.6.[6]

After <u>Rash</u>, courts have employed a multitude of methods in determining replacement

---

[6] In another passage, the Court also appeared to express disapproval of a mechanical valuation methodology of "splitting the difference" between foreclosure and replacement values, at least in the absence of some factual foundation for doing so in a particular case. <u>Id.</u> at 964.

value under §506(a). See, e.g., In re Pearsall, 441 B.R. 267, 270-71 (Bankr. N.D. Ohio 2010) (collecting cases and methodologies); In re Gonch, 435 B.R. 857, 864 (Bankr. N.D.N.Y. 2010) (same).

To further complicate matters, Rash and many of the reported decisions employing various valuation methodologies for determining replacement value were decided prior to the 2005 BAPCPA amendment to §506(a), which added §506(a)(2). Thus, I must also consider the effect, if any, of the BAPCPA amendment on collateral valuation under §506(a). Fortunately, while the BAPCPA amendment to §506(a) adds some complexity to the analysis, its effect is fairly straightforward.

Bankruptcy courts appear to be unanimous in the view that the first sentence of §506(a)(2) codifies Rash in individual chapter 7 and chapter 13 cases by mandating the use of replacement value as the valuation methodology. See, e.g., In re Scott, 437 B.R. 168, 172-73 (Bankr. D.N.J. 2010); Finnegan, 358 B.R. at 648. The second sentence of §506(a)(2) establishes a statutory definition of replacement value for "property acquired for personal, family, or household purposes," as "the price a retail merchant would charge" for property of the age and condition of the secured property.

Thus, in its present form, as it relates to individual chapter 7 and chapter 13 cases, the plain language of §506(a)(2) directs the court to ascertain replacement value in two different ways, depending upon whether the secured property was purchased for consumer or non-consumer (presumably business) purposes.

If the secured property was purchased for some non-consumer purpose, replacement value continues to be determined from the perspective of the debtor under the first sentence of §506(a), as the Supreme Court directed in Rash in 1997: "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."[7] Rash, 520 U.S. at 960.

On the other hand, if the property was acquired for consumer purposes, the second sentence mandates that replacement value be determined from the perspective of a retail merchant, not that of the debtor.[8]

**B.**

In this case, I have found that the Debtor acquired the Vehicle for use in connection with his employment. See Finding of Fact No. 5. Consequently, like the court in Finnegan, 358 B.R. at 648, I conclude that this contested matter is governed by the first sentence of §506(a), instead of the second sentence.

Therefore, I will employ the valuation methodology mandated by Rash, rather than any modification of that methodology mandated by BAPCPA for property purchased for consumer

---

[7]     The first sentence of §506(a) also instructs that the valuation is to be determined as of the date of the filing of the bankruptcy petition.

[8]     Unlike the first sentence, the second sentence does not mandate a specific date of valuation.

purposes. Further, consistent with the first sentence of §506(a)(2), I will determine the value of the Vehicle as of the filing date of the Debtors' bankruptcy petition.  See n.7, supra.

Before proceeding to that task, however, I will briefly digress to examine certain issues that bankruptcy courts have addressed as they have attempted to implement the directives given by the Supreme Court in Rash, both before and after the enactment of BAPCPA.  As elaborated below, courts have employed a multitude of approaches, sometimes driven by the nature of the evidence developed in the particular case, and sometimes driven by an interest in promoting efficiency and predictability.

### C.

In post-Rash cases under §506(a) involving the determination of the replacement value of motor vehicles, courts have repeatedly grappled with two issues.  These issues remain relevant under the first sentence of §506(a)(2):

> (1) how should the court use the commercial reports that are available in the used car industry?; and
>
> (2) should the court use retail value or some other value (such as trade-in, private party or wholesale value) as the starting point in the valuation analysis?

Particularly because cases involving the valuation of motor vehicles frequently are presented to the court without expert valuation testimony, many bankruptcy courts have relied on commercial reports such as the National Automobile Dealers Association Guide ("the NADA

Guide") or the Kelley Blue Book ("the KBB") as a starting point in the valuation process.
Compare Scott, 437 B.R. at 173-74 (following In re Morales, 387 B.R. 36, 37 (Bankr. C.D. Cal. 2008) and using NADA Guide as starting point), with In re Penny, 2011 WL 204888, at *2 (Bankr. N.D. Cal. Jan. 21, 2011) (employing KBB as starting point), and In re Martinez, 409 B.R. 35, 40 (Bankr. S.D.N.Y. 2009) (same).[9]

The far more controversial issue is whether the court should begin with the retail, private party, trade-in, or wholesale values listed in the commercial reports being considered.

In some cases, courts have used retail value and adjusted downward. See, e.g., Scott, 437 B.R. at 174; In re Cook, 415 B.R. 529, 535 (Bankr. D. Kan. 2009). In other cases, courts have started with private party value or wholesale value. See, e.g., Gonch, 435 B.R. at 865-66. Under both of these approaches, the adjustments have been based on considerations such as the condition of the secured property or other relevant factors.

Some courts have taken an average of the reported retail value and the private party or wholesale value. See In re Getz, 242 B.R. 916, 919-20 (B.A.P. 6th Cir. 2000); In re Nice, 355 B.R. 554, 556 (Bankr. N.D. W. Va. 2006); In re Richards, 243 B.R. 15, 19 (Bankr. N.D. Ohio

---

[9] Judicial consideration of the valuation evidence found in these commercial guides is a well-accepted practice. See, e.g., In re Warrington, 424 B.R. 186, 192 n.6 (Bankr. E.D. Pa. 2010) (discussing admissibility of valuation evidence from the KBB under Fed. R. Evid. 803(17)); In re McElroy, 339 B.R. 185, 188 (Bankr. C.D. Ill. 2006) (same). Courts recognize that these reports "provide a neutral and independent source of a vehicle's value," but must be used with caution and are not conclusive because they are "unable to account for the myriad of facts that may be peculiar to a debtor's particular vehicle." In re Wcislak, 417 B.R. 24, 29 (Bankr. N.D. Ohio 2009).

1999); see also L.B.R. 3012-1(b) (Bankr. D. Vt.); King, 2003 WL 22110779, at *5 n.18 (collecting cases).

Other courts have modified the retail value stated in the chosen commercial report by some fixed percentage and used that value as the starting point in the valuation process. See Penny, 2011 WL 204888, at *3; In re Cheatham, 2007 WL 2428046, at *3 (Bankr. W.D. Mo. June 19, 2007); In re Renzelman, 227 B.R. 740, 741-42 (Bankr. W.D. Mo. 1998); In re Mayland, 2006 WL 1476927, at *1 (Bankr. M.D.N.C. May 26, 2006); see also Local Rule 3015-2(g) Bankr. E.D. Mo.) (incorporating court's Procedures Manual, which provides that, absent evidence to the contrary, vehicles will be valued under §506(a) at 97% of the NADA retail value at the time of filing the petition).[10]

In this district, there are two reported cases discussing some of these issues.

In In re Winston, 236 B.R. 167 (Bankr. E.D. Pa. 1999), Judge Scholl surveyed the case law on the subject, much as I have done above, and ultimately concluded:

> [T]he low volume of such matters in our court and the language of the Rash decision convince us that establishment of a set formula for vehicle valuation in a cramdown bifurcation based upon "book" value is neither necessary nor, in light of the Court's statements in Rash, consistent with § 506(a). We therefore believe that **we must be prepared to value vehicles on a case-by-case basis, depending on the evidence presented**. While the parties may stipulate and witnesses may incorporate "book" values into their testimony, it is testimony based on the books' figures that control, not the books' figures in and of themselves.

---

[10] The Procedures Manual of U.S. Bankruptcy Court for the Eastern District of Missouri is available as a link on the court's website. See http://www.moeb.uscourts.gov/pdfs/local_rules/2010/2010%20Procedures%20Manual.pdf.

-12-

Id. at 171 (emphasis added).

In King, Judge Sigmund went a bit further, reasoning:

> To determine replacement value, I must ask what price a buyer in Debtor's position would pay. A buyer in the Debtor's position would not be able to secure a wholesale price for the vehicle. Rather that is generally the price a dealer would pay a consumer for a trade in on her vehicle which is not the situation here. Rather she would pay either retail value or some lesser price if she bought it from a private party. Debtor's valuation presupposes a private sale, while Triad's valuation assumes a retail purchase. Either option would be available to a party in Debtor's position, and therefore **I conclude that the appropriate value is something slightly less than retail to account for the availability of the private sale option**.

2003 WL 22110779, at *5 (footnote and citation omitted) (emphasis added).

**D.**

In this case, because the parties presented specific appraisal evidence and did not rely solely on commercial reports, it is unnecessary for me to decide whether it is essential or appropriate to develop some type of mechanical valuation procedure making use of both the retail and/or other valuations set forth in the reports and whether such a procedure is consistent with Rash. In this respect, I will follow Winston and decide this case without the "establishment of a set formula for vehicle valuation . . . based upon 'book' value." 236 B.R. at 171.

At the same time, however, the parties disagree whether "replacement value" under Rash and the first sentence of §506(a)(2) is ultimately measured by retail value or some other, lower value, such as wholesale or private party value. As will be discussed below, there is evidence in the record regarding both the retail and wholesale value for the Vehicle. Therefore, I must

consider how evidence regarding retail and wholesale value should be treated in a determination of replacement value under §506(a)(2).

After reviewing the case law on the subject, I join the King court in holding that, generally, replacement value under Rash (and, following BAPCPA, under the first sentence of §506(a)(2)) is something less than the retail value. In reaching this conclusion, I am persuaded by the following passage in In re Glueck, 223 B.R. 514 (Bankr. S.D. Ohio 1998), a case cited with approval in King:

> There are numerous other sources for debtors to obtain automobiles at lower costs, avoiding the overhead costs inherent in purchases from automobile dealerships. Debtors are able to purchase automobiles at auctions, from private individuals, from used car lots, from family members, or from rental car companies, just to name a few options. That market is clearly broader than a purely retail market. . . . While it would be easier for this Court to accept the analyses of the courts that equate "retail value" with "replacement value," the Court does not believe this to be mandated by Rash. The Court finds that "retail value" and "replacement value" are not synonymous.

Id. at 519 (emphasis added).

To resolve the present contested matter, my holding can be limited to the principle that replacement value under the first sentence of 11 U.S.C. §506(a)(2) is something less than the retail value. Because the parties in this contested matter offered appraisal evidence (the relative strength of which is discussed in the next section of this Memorandum), I can determine the value of the Vehicle based on my assessment of the competing appraisal evidence presented, rather than through some

**E.**

There was a marked contrast in the nature and quality of the competing appraisal evidence offered by the parties. The Debtors' evidence was especially problematic, and ultimately unpersuasive, in comparison to World Omni's evidence. At the same time, although World Omni's evidence was based on a better foundation, it too, was flawed.

The Debtors introduced two written appraisals into evidence, neither of which was accompanied by supporting testimony of the appraiser. One of the appraisals, written on a sales order form containing the letterhead of P.G. Auto Center and signed illegibly by a salesman (first name "Robert"), valued the Vehicle for private sale or trade-in as $8,200.00. (See Ex. D-1). I know nothing regarding the experience or expertise of the author and the appraisal did not explain how its author arrived at the stated valuation.

The Debtors' second appraisal was written by Anthony Carino on the letterhead of Liberty Toyota Scion. It states an "appraisal amount" of $10,000.00. (Ex. D-2). Again, this appraisal provides no information with regard to the experience or expertise of the author and the appraisal did not explain how its author arrived at the stated valuation. The second appraisal is perhaps even less helpful than the first as it is silent as to whether it is referring to retail, wholesale, trade-in or private party value.

Due to the lack of any explanation regarding the basis for these two appraisals, I find them

to be of little value, especially in comparison to the evidence World Omni offered.[11]

World Omni's expert, Mr. Runiewicz, is extremely well-qualified, having spent over 30 years buying and selling used cars in various capacities. His report reflects that he considered a variety of sources in formulating his opinion that the retail value of the Vehicle, as of July 2, 2011 (when he inspected the Vehicle), was $17,995.00.[12]

Mr. Runiewicz visually inspected the Vehicle and, in his testimony, described his observations regarding its condition (which he deemed excellent). On the internet, he found what he considered to be relatively comparable vehicles being offered for sale by dealers, one in Georgia and the other in Pennsylvania, with asking prices of $17,990.00 and $15,695.00, respectively. He referenced the KBB, which reported a retail value of $18,920.00 for a 2006 Toyota Tundra in excellent condition (and he considered the Vehicle to be in excellent condition because he minimized the body damage that Mr. Henry claimed exists). He referenced the NADA Guide, which stated a clean retail value of $17,600.00. Additionally, he considered market data

---

[11] The Debtors also offered evidence derived from the internet – dealers in California, Illinois, and Texas, offering 2006 Toyota Tundras for sale for $11,977.00, $10,594.00, and $10,400.00, respectively. (Exs. D-4 to D-6). The difficulty with this evidence is that it does not address the relative conditions of the vehicles offered for sale, compared to the Vehicle. Further, my review of the specifications of the two vehicles suggests that they may not be comparable to the Vehicle. For these reasons, I gave no weight to this evidence.

[12] In its response to the Motion, World Omni submitted a "condition report" prepared by an entity named Property Damage Appraisers ("PDA"). The condition report was introduced into evidence as Ex. R-1. In the course of its report, which primarily concerned the cost of the necessary repairs to the body of the Vehicle, PDA opined that the Vehicle's value was $17,075.00. Later in the hearing, World Omni offered Mr. Runiewicz's testimony in which he offered an even higher valuation.

from Manheim.com ("Manheim"), a website maintained by a very large, well-known used car wholesale auctioneer. Mr. Runiewicz explained that Manheim compiles data from actual sale prices at wholesale auctions of automobiles and estimates the expected retail price thereafter. In particular, he relied on Manheim data for the period of July 2, 2011 through July 9, 2011, which suggested that, for a 2006 Toyota Tundra in above average condition, the expected auction price would be $13,950.00 and the estimated retail price would be $17,600.00. Based on all of this data, Mr. Runiewicz formulated his opinion that the Vehicle's retail value is $17,995.00.

In general, I credit Mr. Runiewicz's valuation as he is experienced in the field and he employed what appeared to be a well-accepted valuation methodology. I found the valuation evidence he offered far superior to the evidence offered by the Debtors. I do not, however, accept his testimony unconditionally. For example, I am uncertain that he is correct in placing a value on the Vehicle that is higher than the $17,600.00 clean retail value stated in the NADA Guide.[13]

More importantly, I cannot adopt his ultimate conclusion on the value of the Vehicle, because it was based on an incorrect valuation standard. Mr. Runiewicz opined as to the <u>retail value</u> of the Vehicle as of the <u>date of the hearing</u>, and that is not the factual issue in this contested matter. The issue is the <u>replacement value</u> as of the <u>date of the Debtors' bankruptcy petition</u>.

---

[13] His valuation exceeds both the NADA Guide clean retail value and the <u>asking price</u> (as opposed to the actual sale price) of the two vehicles that he referenced in his testimony as currently being offered for sale. It appears that he slightly increased the retail values suggested by the NADA Guide and Manheim in light of the higher value suggested by the KBB. He did not explain why that was appropriate.

That said, the data that Mr. Runiewicz presented in support of his opinion permits me to adjust Mr. Runiewicz's valuation to harmonize it with 11 U.S.C. §506(a)(2). The information presented by Mr. Runiewicz that is most helpful is the Manheim data suggesting that the expected auction price would be $13,950.00 and the estimated retail price would be $17,600.00.[14] Thus, the "swing" is $3,650.00.

In the particular circumstances of this case, I find it appropriate to determine the value of the Vehicle by adjusting its likely retail price downward by a significant margin. Mr. Henry may or may not have access to wholesale automobile auctions, but in light of his connection to the automotive industry, I consider it extremely likely that, in replacing the Vehicle, he would access some alternative source other than a retail used car dealership. See Glueck, 223 B.R. at 519. Therefore, in this particular case, I determine that the Manheim estimated retail price should be reduced by 70% of the difference between the estimated retail price and the wholesale price (i.e., by 70% of the $3,650.00 "swing").[15] This results in an adjustment (reduction) of the $17,600.00 retail value by $2,555.00 and a replacement value of $15,045.00.

Before concluding my valuation analysis, I must account for two other factors: (1) the $563.95 in repairs needed to fully restore the body of the Vehicle to excellent condition, and (2)

---

[14] It also appeared to me that Mr. Runiewicz relied more heavily on the Manheim data than the other sources that he consulted.

[15] Were Mr. Henry just an "average consumer," it may have been appropriate to make a less substantial reduction. Whether that would be the "something slightly less than retail" adjustment described in King, 2003 WL 22110779, at *5, or something else, I leave for another day.

the date of valuation. These factors cut in opposite ways. The necessary repairs reduce the replacement value of the Vehicle. The valuation of the Vehicle as of July 2, 2011, rather than August 2, 2010, would require an upward adjustment in the replacement value due to depreciation of the Vehicle's value in that eleven month period.[16]

There is nothing in the record that would assist in quantifying the Vehicle's depreciation in value from August 2010 to July 2011. In the absence of such evidence, and based on my role as fact-finder in "connecting the dots" to fill in gaps in the evidence, I find that the depreciation approximates the $563.95 of the repair costs. Therefore, no further adjustment to the previous value determination is necessary, and the replacement value of the Vehicle remains $15,045.00.

V.

For the reasons set forth above, and because I have determined that the replacement value of the Vehicle is $15,045.00, I will: (1) grant in part and deny in part the Motion and (2) enter an order allowing World Omni's claim as a secured claim in the amount of $15,045.00 and unsecured claim in the amount of $4,374.93.

An order consistent with this Memorandum will be entered.

---

[16] Mr. Runiewicz testified that a 2006 Toyota Tundra did not depreciate in value between August 2010 and July 2011. His opinion is contrary to conventional wisdom regarding the depreciation of motor vehicles. I can conceive of market conditions that may permit a used motor vehicle to fully retain its value for an eleven month period; however, Mr. Runiewicz did not explain why a "gas-guzzling" pickup truck like the Vehicle would have retained all of its value in the particular eleven months involved here. I find his testimony on this point counterintuitive, and I do not credit that part of his testimony.

Date:  August 18, 2011

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**